No. 6.—DAVID M. BURNS, plaintiff in error, *vs.* LUCY HILL, *et al.* defendants in error.

[1.] An infant may commit a fraud for which he can be made answerable *civiliter*. But it cannot be said to be an act of *legal* fraud for infants to repudiate an agreement which is not binding on them in law because of their infancy.

[2.] This view is aided by the fact, that there is nothing in the record which shows, that when the infants made the agreement by which it is sought to bind them, they had any knowledge of their rights in the premises.

[3.] The fact that the parents of such infants were in straightened circumstances, and that the infants may have parted with certain property, for the purpose of procuring a home for their parents and themselves, does not constitute a sufficient consideration for an agreement by which such property was to be taken for their father's debts; for maintenance is due from the parent to the infant, and not from the latter to the former.

[4.] There must be a consideration to sustain every contract.

[5.] A bill will not be maintained to secure a discovery, where such discovery would be useless.

[6.] An equitable off-set will be allowed, although the amount be small, and although the party may have a remedy at Common Law, if to recover that small amount he be driven to many suits and to much trouble and expense.

In Equity, in Jackson Superior Court. Decision on demurrer, by Judge JACKSON, August Term, 1855.

David M. Burns filed his bill, alleging that, about the year 1821 he loaned to Lewis Pyron $950 and took a mortgage on two negroes, Violet and Tobe; that this money was borrowed to pay off the debts of Pyron, and secure a home for his family; that, subsequently, hearing that there was some difficulty about the title of Pyron to the slaves, he went to Pyron and inquired of him and his family, consisting of his wife and children, (all of the latter being of an age to understand the import of the transaction, except one,) and they all informed him that there was no such difficulty, or any claim whatever; that, then, in the presence of all of them, and with their full consent, he purchased the negroes from Pyron, and took a bill of sale, signed by him, and also by

Burns *vs.* Hill *et al.*

A. L. Hill, (the husband of Lucy, the oldest daughter,) and by Sarah Pyron, the second daughter, who also represented herself to be of age; that at the same time he took a bond from the same persons, obligating themselves that the younger children, as soon as they arrived at age, should release to him all and every claim, whatsoever, to the negroes; that, subsequently, Pyron moved to Tennessee and there died, possessed of a small estate worth $100; that his debts amounted to $39, and the remainder ($61) was distributed to his children; that Mrs. Pyron subsequently died, and the children claiming an interest in remainder in these slaves, have commenced an action of trover against Burns to recover these negroes. The bill alleges that the "above stated facts are known to the plaintiffs, and complainant can only fully prove them by resorting to their consciences." The prayer was for an injunction and an accounting for the sixty-one dollars, for the breach of warranty in the bill of sale of Pyron, in the event of a recovery by the children.

On demurrer, for want of equity and an adequate remedy at law, the Court dismissed the bill. This decision is assigned as error.

PEEPLES; HILLYER; COBB & HULL, for plaintiffs in error.

T. R. R. COBB, for defendants in error.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] There were two classes of persons concerned in the making of the contract, as it is alleged by the plaintiff in error. *First*, there were the infant children of Lewis Pyron. *Secondly*, the adults, consisting of Pyron, his son-in-law, A. L. Hill, and his daughter, Sarah Pyron.

The charges in the bill are those of fraud in the transaction set forth, shared by all these persons, and of user and enjoyment by them, of the money paid to Pyron by General Burns, for the land.

Let us first consider the interests of the infants.

Did their conduct constitute fraud? Undoubtedly an infant may be a *tort feaser*—may commit a fraud for which he can be made answerable *civiliter.* Was there such fraud here? The alleged grounds of fraud are, that they consented to the contract of purchase—induced the complainant in this bill to believe that it was a good and binding contract on them—took the benefit of it—used and enjoyed its fruits, and now repudiate it. This is the full effect of what the bill charges.

Now admitting that these infants did receive a consideration for the consent which they gave to the sale of the negroes, by enjoying the proceeds of such sale, and that they afterwards repudiated their agreement to stand by their consent, we think that this does not amount to *legal* fraud, on their part; that it cannot correctly be said to have been an act of legal fraud for them to repudiate an agreement which was not binding on them in law. If they were infants, they could not be made answerable *directly* for such a contract. If not *directly* answerable, they cannot be made so *indirectly*.

[2.] Besides, there is nothing in the record which shows that they had any correct knowledge of the rights which they had in the premises. True it is, according to the bill, that they were of a sufficient age to understand the import of the transaction; but it does not appear that they were of an age to have the custody of their own papers and titles, and thus to be informed of their rights. And there is nothing stated, going to show that they acted with a full and accurate knowledge of their rights.

[3.] For the sake of the proposition just submitted, we have admitted that a consideration moved to these infants for the consent which they gave to the purchase of this land. But is this admission justified by the facts?

It was argued, that inasmuch as the parents were in straightened circumstances, and the children were possessed of some property, they might very properly have parted with the same for the sake of the land and home for which the money

of Gen. Burns was paid by their father.    We learn, however, in our elementary lessons, that parents are legally and in duty bound to maintain their infant children.    The maintenance, then, which these children received, was their due; and they were under no legal obligation to pay for it.

It would be a very dangerous and unprecedented rule which, by such a transaction as is here set forth, would allow infant children, while yet inexperienced, unacquainted with their rights, and under the influence of their parents, to bind property settled upon them and render it liable for a father's debts, so as to deprive themselves of an interest in remainder in the same.

[4.] There is another reason why these infants are not liable on the contract for want of consideration, which applies as well to the other children.    We will therefore proceed to notice the interests of A. L. Hill and wife, and Sarah Pyron.

It may be assumed that the bill shows that these two daughters were of age and capable of binding themselves by the contract which it is alleged was made with Burns in 1824, though this does not clearly appear.    Still, we find a difficulty in sustaining the bill against them; for it is our opinion that this bill does not show any consideration whatever for the contract which it is said these persons are endeavoring fraudulently to repudiate.

If the allegations be examined, it will be found that the complainant, in effect, only alleges, that these persons, being of age, consented to the sale of the slaves, solicited the complainant to purchase, assured him that no difficulty existed as to the title; and to prevail on him to make the purchase, executed a bond of indemnity in his favor.    Now if all this be admitted, what did Gen. Burns lose by such conduct; and what did these persons, or the infants in question, gain by it? If he did not lose by it and they did not gain, surely there was no fraud in their conduct.    His mortgage was on the slaves, and he could sell nothing but the slaves by it.    He got them without a foreclosure and sale under it; and so, got

all his mortgage could have given him. Did he forbear to sue and put his debt into judgment by reason that the slaves were thus given up to him? If he had done so, forbearance to sue would have constituted a sufficient consideration, perhaps. But this is not alleged. The nearest approximation to it are the allegations, "that said purchase was made by him after and upon full consideration had by and amongst all the said family, who determined that by so doing; that is, by making said sale, was the only way which they could secure a home, as without this their land and other property would have to be sold, and would not more than have paid their debts," &c. This is altogether too vague and indefinite. *How* was this the only way in which they could have secured a home? He does not show. What is meant by the allegation, that "without this their land would have been sold?" Sold how, and by whom? It does not appear. Such loose allegations are not issuable, and cannot be received as definite statements.

For all that appears in the bill, there may have been executions against Pyron to a larger amount than the value of his property, and a suit by the complainant would have proved fruitless. If it were otherwise, however, and the complainant did forbear to sue, as a consideration for the consent alleged to have been given, this should have been distinctly alleged. In the above considerations, we have left out of view the coverture of Mrs. Lucy Hill, one of the children of Pyron, and one of the alleged contracting parties.

[5.] It was insisted that this bill should be maintained, if it were only for purposes of discovery.

The views which we submit, of course show that discovery would be useless; and the bill cannot be sustained on that ground, unless it be as to the equitable off-set which is pleaded; but that off-set does present a claim, small and insignificant as it is, which must give to the complainant's bill a *stand-point* in Court as it is, if he desire it.

[6.] We think there are sound, equitable reasons why the complainant should be permitted to press that claim, if he

wish to do so in this way. Small as it is, it is his right. If he lose these slaves by reason of the suit instituted by these distributees, who have received their portions of Lewis Pyron's estate, he should be allowed to collect it out of them. A suit at law may be maintained against them; but it is plain that this will be attended with trouble, expense and multiplicity of suits. All these Equity abhors. The amount due by each will be small, not exceeding the jurisdiction of a Justice of the Peace in Georgia. If he be compelled to sue and pay Attorney's fees in these cases, a small sum (if any thing) will be left to him. He should, therefore, be permitted to maintain his set-off.

Let the judgment be reversed on this ground.